# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| KAREN JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-00518-CV-RK |
| | ) | |
| JACOB J. LEW, SECRETARY, | ) | |
| DEPARTMENT OF THE TREASURY; | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is a Motion for Summary Judgment filed by Defendant Jacob L. Lew, Secretary of the Department of Treasury (the "DOT" or "Defendant"). (Doc. 23.) Plaintiff Karen Jackson, an African American, Muslim employee of the Internal Revenue Service, brings this action against the DOT, alleging discrimination on the basis of her race and religion as well as retaliation for Equal Employment Opportunity ("EEO") activity in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* For the reasons below, the motion is **GRANTED**.

## I.      Facts[1]

### A.      General Background Employment Information

Plaintiff has been employed by Defendant since January 20, 1997. (Complaint ¶ 3, doc. 1; Pl.'s Decl. Ex. 2, at p.00176, doc. 23-2.) As of October 10, 2007, Plaintiff began working in her current position as a contact representative in Accounts Management. (Complaint ¶ 1; Pl.'s Decl. at p. 00176.) Plaintiff has a satisfactory work record and most recently was assigned to work the night shift. (Complaint ¶ 8.) Plaintiff is an African American and a practicing Muslim. (Pl.'s Decl. at pp. 00176-77.)

Jacqueline Nicks ("CM Nicks"), a white female, was Plaintiff's Front-Line Supervisor Contact Manager from January 27, 2013, to January 27, 2014. (Nicks Decl. Ex. 3, at p. 00218,

---

[1] The Court takes the following facts as true for the purpose of the subject motion; the facts are either undisputed, or not properly addressed or disputed pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1. The Court adopts Defendant's organization of the facts. (*See* DOT Final Agency Decision Ex. 36, doc. 23-36.)

doc. 23-3.) Plaintiff's second level supervisor, Kimberly Block ("DM Block"), was the Department Manager for Wage and Investment, Accounts Management from February 2012 to June 15, 2013. (Block Decl. Ex. 4, at p. 00252, doc. 23-4.) DM Block identifies her race as black and her religion is African Methodist Episcopal. (*Id.*) Kim Bailey ("OM Bailey") was Operations Manager of Kansas City Accounts Management in 2013. (Bailey Decl. Ex. 5, at p. 00306, doc. 23-5.) OM Bailey identifies her race as black and her religion is Baptist. (*Id.*)

CM Nicks and Plaintiff were part of Team B103 within Kansas City Accounts Management, which in 2013, consisted of twelve other employees—eleven contact representatives and one clerk. (Team B103 Ex. 7, doc. 23-7.) Of these twelve other employees, three employees are black and one other employee identifies her religion as "Non-Christian." (*Id.*)

To date, Plaintiff's performance evaluations as a contact representative have been at least "meets expectations" indicating that she can and has performed the essential functions of her job to expected levels of performance. (Complaint ¶ 8.) In December 2013, Plaintiff received an annual performance appraisal from CM Nicks and a reviewing official with an overall rating of "Exceeds Fully Successful." (Perform. Appraisal Ex. 6, at pp. 00547-556, doc. 23-6.)

**B. Hostile Work Environment, Disparate Treatment, and Retaliation under Counts I, II, and III (Claims 1-13)**

**Claim 1: Since April 2013, Plaintiff's supervisor is hostile and condescending towards her and tries to intimidate her.**

Plaintiff does not allege that any offensive, vulgar language or slur regarding her race or religion was directed at her or spoken in her presence. (Pl.'s Decl. at pp. 00177-181.) Plaintiff does not recite any insult, racial or religious jokes made to her. (*Id.*) Plaintiff supports this claim by a sworn statement she received that CM Nicks frequently used offensive and vulgar language when speaking of Plaintiff and other African American employees. (Pl.'s Decl. at p. 00177; Syring Decl. Ex. 1b, doc. 29-2 at 7.)

CM Nicks denies being condescending towards Plaintiff or intimidating her. (Nicks Decl. at pp. 00218-19.) CM Nicks states that Plaintiff was provided feedback for not closing cases and regarding timeliness, time utilization, workload management, and failure to follow directives. (*Id.* at p. 00219.)

DM Block asserts she is not aware of Plaintiff being harassed. (Block Decl. at p. 00252.) DM Block states Plaintiff reported that her managers did not like her after she was counseled or

2

received critical feedback on performance or conduct issues by managers Susan Walton in 2012 and CM Nicks in 2013. (*Id.* at pp. 00252-53.) DM Block states that when discussing the feedback with Plaintiff, Plaintiff remarked a desire to do better. (*Id.* at p. 00253.) DM Block asserts other employees in Plaintiff's group, Eugenia Evans, and Rodney Hader, and others, had similar performance issues and received similar feedback. (*Id.* at p. 00254.) DM Block asserts performance, attendance and conduct were addressed with all employees. (*Id.*)

OM Bailey recalls a meeting with Plaintiff and her "NTEU representative."[2] (Bailey Decl. at p. 00306.) OM Bailey recalls the union representative advising Plaintiff not to answer OM Bailey's question, but does not recall the specific question. (*Id.* at p. 00307.) OM Bailey states that during that time period, NTEU was making a concerted effort to disrupt "the Department" and Plaintiff's work unit causing employees to make unreasonable demands and refuse to follow management directives. (*Id.*) OM Bailey witnessed Plaintiff refusing to follow contract provisions for requesting and receiving, among other things, religious compensatory time ("RCT") and pursuant to the Family Medical Leave Act ("FMLA"). (*Id.*)

**<u>Claim 2:</u>** **After May 10, 2013, Plaintiff's supervisor denied her request for advanced sick leave for the period of May 6, 2013, through May 10, 2013, and she was required to take annual leave.**

Plaintiff began 2013 with no reservoir of built-up sick leave or annual leave. (*See* Walton Memo. Ex. 8, at p. 00529.) As of May 18, 2013 (pay period 9), Plaintiff had an annual leave balance of zero and a negative sick leave balance (-57.25). (SETR T&A Record, Oct. 3, 2014, Ex. 9, at p. 00499.) In early 2013, Plaintiff electronically requested annual leave for July 9, 2013, which was the first day of Ramadan. (*See* Pl.'s Decl. at p. 00207.) In May 2013, Plaintiff alleges that a tree fell on her home during a late snow storm and that during cleanup and removal of the tree, she injured her back. (*Id.* at p.00181.) Plaintiff had no sick leave to use during her absence in May 2013. (SETR T&A Record, Oct. 3, 2014, at p. 00499.) Because Plaintiff had no sick leave, her absences in May 2013 were originally characterized as absent without leave ("AWOL"). After Plaintiff provided medical documentation, the time she was absent, May 7 through May 10, 2013—was recorded as 9.5 hours annual leave, and 30.5 hours Leave Without Pay ("LWOP"). (SETR T&A Record, Oct. 3, 2014, at p. 00499.)

---

[2] "NTEU" stands for National Treasury Employees Union. Going forward, references to "NTEU" and "union" in this Order are used synonymously.

All LWOP, advance annual, and advance sick leave is approved by the Operations Manager. (Block Decl. at p. 00268.) This policy was in place in the Kansas City directorate to ensure consistency. (*See Id.*) OM Bailey denied Plaintiff's requests submitted on May 14 and May 20, 2013, for advance sick leave for the period of May 6 through May 10, 2013, because the requests were submitted after the leave was taken. (Pl.'s Leave Req. Ex. 10, at pp. 00511-16, doc. 23-10.) OM Bailey approved LWOP for that time period. (*See id.* at p. 00511.)

An Employee Leave Audit of Plaintiff's use of leave from January 13 to December 29, 2013, showed that she used 209.50 hours of annual leave, 46.75 hours of sick leave in December 2013, 4.50 hours of RCT, 40.50 hours of LWOP and 219.50 hours of other leave, including administrative leave and her furlough during the government shutdown in October 2013. (Employee Leave Audit Ex. 11, at pp. 00495-00496, doc. 23-11.) The audit reflected Plaintiff had 1.50 hours of AWOL for pay period 12 (June 16 - 29, 2013) and 1.75 hours for pay period 25 (December 15 - 28, 2013). (*Id.*)

**Claim 3:** **In or around June 2013, Plaintiff's supervisor rejected her FMLA forms and made her complete new forms before approving FMLA leave for the period of May 13, 2013, through June 1, 2013.**

Plaintiff requested leave pursuant to the FMLA covering the period from May 13 through May 28, 2013, which was provisionally granted by CM Nicks. (Plt.'s FMLA Appl. Ex. 12, at p. 00506, doc. 23-12; Nicks FMLA Memo. Ex. 13, at p. 00508, doc. 23-13.) Plaintiff did not request advance sick leave for this period. (*See* Pl.'s Leave Req., at pp. 00511 and 00513.) FMLA leave was denied when the medical information was determined by Federal Occupational Health to be insufficient. (Nicks FMLA Memo., June 1, 2013, Ex. 14, at p. 00509; Nicks Decl., at p. 00221.) LWOP pursuant to FMLA was later granted for the period after further medical information was provided by Plaintiff and her physician.

**Claim 4:** **On June 5, 2013, Plaintiff was issued a disciplinary memorandum for insubordination.**

CM Nicks issued Plaintiff a memorandum dated June 5, 2013, for failure to follow a management directive. (Nicks Memo., June 5, 2013, Ex. 15, at p. 00528, doc. 23-15.) During a team meeting on June 4, 2013, the team was reminded that it would be performing four hours of "CIS" work on Tuesdays and Thursdays until further notice and that after the meeting, everyone was to begin "statute stamping/clearing" work. (*Id.*; *see* Nicks Decl., at pp. 00221-22.) Plaintiff,

4

instead of performing any statute stamping/clearing work, worked on a case she had been working prior to the meeting. (*Id.*)

Plaintiff's excuse was that a white male on the team, Rodney Hader, asked permission to complete the case he was working on prior to undertaking the new task assigned to the team during the June 4 meeting, and CM Nicks approved the request. (Plt.'s Decl. at p. 00185.) Plaintiff stated she had a case similar to Mr. Hader's and presumed that CM Nicks' authorization of Mr. Hader's action would apply to her as well even though she did not request permission to deviate from the directive. (*Id.*)

DM Block reviewed CM Nick's June 5, 2013 memorandum at Plaintiff's request and found Plaintiff's work that day did not preclude her from following her manager's directive to work statute cases. (Block Decl. at pp. 00257-58.) DM Block found the memorandum to be warranted. (*Id.*)

**Claim 5:**       **Since June 2013, Plaintiff has been denied proper Identify Theft training.**

On April 22, 2013, Plaintiff was notified to attend Identity Theft class from April 30 through May 3, 2013. (Nicks Decl., at p. 00222.) She attended 28 hours of the 32 hours provided, while missing some number of hours because of her absence. She also missed the on-the-job follow-up training. Plaintiff was scheduled for the Identity Theft Refresher training on June 11-12 from 7:30 a.m. through 4:00 p.m. (*Id.*) On June 12, 2013, Instructor Erika Miller sent an e-mail to Plaintiff's supervisor indicating Plaintiff was sleeping, playing with her phone and surfing the internet during class. (*Id.* at pp. 00222-23.) Plaintiff was provided 8 hours of additional Identity Theft training (2 hours each day for four days) from August 28 through September 4, 2013, by the same instructor who taught the original class. (*Id.* at p. 00223.) Plaintiff conceded that she nodded off during the refresher training. (Plt.'s Decl., at p. 00186.)

**Claim 6:**       **On or about June 19, 2013, Plaintiff's supervisor made repeated trips passing by her desk, stopping at her desk and invading her workspace.**

CM Nicks did not recall closely observing or paying more attention to Plaintiff than any other employee on June 19, 2013. (Nicks Decl., at p. 00224.) CM Nicks was responsible for 15 employees in three aisles and walked up and down these aisles throughout the day to speak to everyone and observe what they were doing. (*See id.*) Employees are expected to be productive and use their time wisely. (Nicks Decl., at p. 00224.) CM Nicks observed Plaintiff not working on several occasions and being on a cell phone, e-mail, or an I-pad. (*Id.*) Plaintiff does not allege that CM Nicks ever touched her or made any obscene, vulgar, offensive or bigoted

5

comment or gesture regarding her race or religion in her presence. (Plt's Decl., at pp. 00177-181 and 00188-89.)

**Claim 7:**      **In or around the week of June 24, 2013, Plaintiff was treated differently than her coworkers when she was told to work the telephones.**

Plaintiff alleges that temporary work leader Kevin Bowen asked her to work the phone when she was expecting to work "ID theft cases," and she claims that she was the only employee asked to get on the phones. (Plt.'s Decl., at p. 00190.) CM Nicks stated that Plaintiff would have been assigned to the phone to meet phone staffing requirements. (Nicks Decl., at pp. 00225-00226.) Any team member may be assigned to that work. (*Id.*) Talking with taxpayers on the phone is a core element of Plaintiff's job description as a contact representative. (*See* Nicks Decl., at p. 00226.)

DM Block testified that Plaintiff's duties as a contact representative requires working both account phones and adjustment paper. (Block Decl., at p. 00262.) DM Block states Plaintiff would have been asked to staff the phone to meet call volumes. (*Id.*) DM Block reports that Plaintiff's timesheet reflects work of 1 hour phone time for the week and notes that Plaintiff's team had the highest phone requirements for the Department that week. (*Id.*)

A review of the phone log records shows during the week in question that Plaintiff was actually on the phone for 1 hour, 37 minutes, and 10 seconds. (Phone Records Am. Ex. 16, at pp. 04256-04260, doc. 32-1.) An additional three team members each logged over an hour on the phone. (*Id.*)

**Claim 8:**      **Since on or around June 24, 2013, Plaintiff has been issued unfair performance feedback, including receiving excessive evaluation reviews and time utilization memoranda, and not being given the benefit of non-evaluative reviews.**

Managers are required to perform work reviews of each team member on a regular basis. DM Block testified that the relevant guidelines provide for completion of evaluative reviews as follows:

- Frontline Managers are required to complete 2 evaluative reviews (per month)
- Leads are required to complete 2 evaluative reviews (per month)
- Weekly Age Case Listing Reviews are required
- 2 Critical Job Element (CJE 5) reviews
- Efficiency Reviews as warranted
- Form 3081 Reviews

6

And various other reviews/feedback based on the employee's performance. (Block Decl., at p. 00263; *see* IRM 1.4.16 Ex. 33, at pp. 04192-97, doc. 23-33.)

Reviews of Plaintiff's work were not excessive and were within management guidelines for reviewing employee performance. (Plt. Eval. Report Ex. 17, pp. 00645-00671, doc. 23-17.) A cumulative report of the Embedded Quality Review System sets forth a total of 40 Evaluative Reviews of Plaintiff's work in 2013. (*Id.*) Over an equal period of time team member Sallie Rasmussen, a white Christian, had 41 evaluative reviews of her cases. (Rasmussen Eval. Report Ex. 18, at pp. 02900-02921, doc. 23-18.) A chart prepared by the EEO Investigators regarding the number of work reviews of the members of Team B103 from May to December 2013 shows that the number of reviews of Plaintiff's work is consistent with the number conducted on her co-workers. (Team B103 Review Chart Ex. 20, doc. 23-20.) Non-evaluative reviews are only used when employees have not passed a certification process or they are on a Performance Improvement Plan ("PIP"). (Nicks Decl. at pp. 00228-29.) Plaintiff was fully certified and was not on a PIP. (Block Decl. at p. 00264.)

**Claim 9:**     **On July 16, 2013, Plaintiff's supervisor followed her when she left a group meeting in progress, and scolded her for leaving, and was dismissive towards Plaintiff who indicated she had left to eat something to break her daily fast for Ramadan.**

Plaintiff states she was fasting from sun-up to sun-down for Ramadan on July 16, 2013. (Plt.'s Decl. at p. 00194.) Plaintiff abruptly left a team meeting to eat a couple of crackers and drink some water because she was feeling light headed. (*Id.*) Plaintiff did not advise her supervisor why she was walking out of the meeting room. (*See id.*) CM Nicks followed Plaintiff out of the meeting room and questioned her. (*See* Nicks Decl. at p. 00229.) (Nicks Decl. at p. 00229.) During the exchange, Plaintiff does not allege that any vulgar, bigoted or offensive language was used by her supervisor when she was asked why she had left or told to return to the meeting. (*See* Plt.'s Decl. at p. 00194.)

**Claim 10:**     **On or around July 23, 2013, Plaintiff was issued a memorandum that unfairly required her to secure advance approval of religious compensatory time ("RCT") and submit her request on a specific form.**

CM Nicks sent Plaintiff a memorandum dated July 27, 2013, confirming their July 22 discussion regarding Plaintiff's RCT. (Nicks Memo, July 27, 2013, Ex. 21, at p. 00520, doc. 23-21.) CM Nicks wrote that July 9 will be changed to RCT and AWOL charges will be removed; that any RCT worked before July 22 would be reinstated with a Time and Attendance ("T&A")

correction; that Plainitiff will begin RCT effective immediately and understood that she must complete Form 10590 and the form must be approved before RCT can be worked; that the request cannot be placed in CM Nicks' mailbox; that if RCT is not paid back within 120 days of the absence, the outstanding balance will be converted to annual leave or LWOP; and that Plaintiff requested July 9 and August 8 as religious observance days. (*Id.*)

Another employee, Marilyn Neblett, who sought RCT was verbally informed of the requirements on August 29, 2013, and was given a follow-up memorandum advising her of her RCT requirements. (Nicks Decl. at pp. 00245-46.) The IRS Manual provides requirements for requesting and approving RCT, which includes the requirement that a request be submitted to an employee's manager in writing identifying the need to abstain from work, in advance whenever possible. (IRS Manuel Religious Comp. Time Ex. 22, at p. 03956, doc. 23-22.) The Manual further provides that the employee and manager must establish a plan that documents the RCT that will either be worked in advance of the requested time off or worked after the rime off is taken. (*Id.*)

**Claim 11:**   **On or around August 6, 2013, Plaintiff's supervisor demanded to know specific information about her meeting with EEO.**

CM Nicks questioned Plaintiff about her meeting with an EEO counselor, including with whom at the EEO Plaintiff met. (Nicks Decl. at p. 00231.) NTEU's National Agreement II provides in part that employees should notify their supervisors when requesting official time, where they will be, for how long, and a general description of the activity for which the time will be used. (2012 Nat'l Agreement II Ex. 23, at p. 17, doc. 23-23.)

**Claim 12:**   **On August 28, 2013, Plaintiff was issued three disciplinary memoranda for her RCT credit hours, her request for Identity Theft training, and failure to follow a management directive, respectively.**

   a.   August 23, 2013 Memorandum

On August 23, 2013, Plaintiff was issued a memorandum from CM Nicks with the subject heading of "Overtime, Credit and Compensatory Time". (Nicks Memo., Aug. 23, 2013, Ex. 24, at p. 00524, doc. 23-24.) The memorandum provided that Plaintiff had "agreed to complete a Form 10590 each day to request to work [RCT,]" but that Plaintiff had improperly submitted the form to CM Nicks' mailbox and Plaintiff worked RCT for August 19, 20, and 21, "without prior approval[.]"   (*Id.*)   The memorandum further instructed Plaintiff "that any compensatory or credit hours worked must [sic] authorized before the work is done." (*Id.*)

8

Plaintiff does not allege that she was denied RCT or leave for the August 8 religious holiday referenced in the July 27, 2013 memorandum. (*See* Nicks Memo, July 27, 2013, at p. 00520.) Plaintiff did not claim and there is no evidence that she was denied pay for any compensatory time she may have worked in August 2013. Plaintiff was not disciplined or threatened with discipline for observing her religious holiday on August 8, 2013.

b.   August 24, 2013 Memorandum

On August 24, 2013, CM Nicks issued Plaintiff a memorandum with the subject heading of "Failure to Follow a Management Directive." (Nicks Memo., Aug. 24, 2013, Ex. 26, at p. 00523, doc. 23-26.) The body of the August 24, 2013 memorandum stated as follows:

> This memo is regarding your failure to follow a management directive given to you on Thursday, August 8, 2013. I gave you your Aged Case Listing and advised you to close the twelve (12) cases by close of business on August 16, 2013. As of this date, there are eleven (11) cases that remain in your inventory, five (5) cases that still have not had any case action since June 17, 2013.
>
> You were also given a Failure to Follow a Management Directive memo dated June 5, 2013, and August 13, 2013. During each of these discussion's you were cautioned that any further incidents and/or violations of the Rules of Conduct will result in disciplinary actions.
>
> **FAILURE TO FOLLOW A MANAGEMENT DIRECTIVE 5 C.F.R. § 2635.101-107**
>
> Refusal to obey orders; willful failure to follow supervisory instructions or requirements; defiance of authority and other such acts of insubordination.
>
> You are expected to respond readily to the direction of your supervisors and conduct your relations in a manner that does not cause dissension or discord.
>
> **IRM 6. 735.1.2(2)** *PERFORMANCE OF DUTY* **IRM 6. 735.1.2(2)**
>
> Not following managerial directives is unacceptable and will result in disciplinary action.

(*Id.* (emphasis in original).)

Plaintiff did not dispute the factual substance of the memorandum. Plaintiff had been advised of "Aged Cases" that needed to be closed by a specified date and had not done so. No discipline of Plaintiff followed the issuance of this memorandum. No discipline was ever proposed.

b.   August 27, 2013 Memorandum

On August 27, 2013, Plaintiff was issued a memorandum from CM Nicks with the subject heading of "Identity Theft." (Nicks Memo., Aug. 24, 2013, Ex. 26, at p. 00523, doc. 23-

26.)  The August 27, 2013 memorandum provided that Plaintiff would be "provided assistance and coaching to improve [her] quality and efficiency in the Identity Theft program."  (*Id.*)  The memorandum further provided that Plaintiff would be "provided two (2) hours a day for a total of eight (8) hours beginning on Wednesday, August 28, 2013."  (*Id.*)  Plaintiff did not sign or date any of the memoranda referenced in this claim, which stated: "My signature acknowledges my receipt of this memorandum but not necessarily my agreement with the information contained therein."  (*E.g.*, Nicks Memo., Aug. 27, 2013.)

**Claim 13:**   **On September 13, 2013, Plaintiff was issued a disciplinary memorandum for failure to follow a management directive given on July 27, 2013, to complete a specific form when requesting RCT.**

On September 13, 2013, Plaintiff was issued a memorandum as a follow-up to verbal communications between Plaintiff and CM Nicks.[3]  Apparently union representatives were discouraging Plaintiff from complying with the use of the form requested by CM Nicks when seeking pre-approval of the RCT Plaintiff wished to work.  (*See* Bailey Decl. at p. 00307.) Plaintiff was not disciplined as a result of this memorandum nor did CM Nicks ever request that any disciplinary action be taken.

### C.   Discrimination for Failure to Provide Religious Accommodation under Count I (Claims 14-15)

**Claim 14:**   **Plaintiff was denied time off on July 9, 2013, to observe the first night of Ramadan and charged 4.5 hours of AWOL.**

Plaintiff took off the first night of Ramadan on July 9, 2013.  Plaintiff had posted for annual leave earlier in the year via the electronic time keeping system.  However, on July 9, 2013, Plaintiff had no annual leave and she was initially charged 4.5 hours of AWOL. On July 27, 2013, Plaintiff's AWOL charges for July 9 were removed and RCT was allowed and substituted.  (SETR T&A Record, Oct. 20, 2014, Ex. 27, at p. 04267, doc. 23-27; Nicks Memo, July 27, 2013, at p. 00520.)  Plaintiff was not disciplined for observing the July 9, 2013 religious holiday.

---

[3] No citation to evidence is provided for this memorandum, and upon review, it does not appear to be a part of the record.  Plaintiff states that for this reason, she "was not able to directly comment on" the memorandum.  For purposes of summary judgment, the Court does not consider the specific contents of the memorandum as recited by Defendant.

**Claim 15:** **Plaintiff was denied time off on October 17 and 18, 2013, to observe Eid al-Adha.**

Plaintiff states October 15 through October 18, 2013, was a four-day religious holiday Eid al-Adha. Plaintiff states she submitted a written request to use leave for this holiday and followed up on the request in August 28 and September 5, 2013 e-mails. Plaintiff states on September 12, 2013, CM Nicks replied to her e-mail and said personnel's research revealed Eid al-Adha is a one-day holiday and Plaintiff needed to explain why her request was for 3 days. A Google search for Eid al-Adha 2013, prompts a statement at the top that "Eid al-Adha 2013 began on the evening of Monday, October 14 and ended in the evening of Tuesday, October 15. Dates may vary." (Google Search Ex. 35, at p. 1, doc. 23-35.) Further Google research shows that the holiday actually can last up to 3 or 4 days depending upon location and tradition. Plaintiff states she secured proof of the holiday from the Islamic Center but the government shutdown in October 2013 prevented her from submitting this documentation.

The federal government shutdown commenced on October 1, 2013, and ended October 16, 2013, with furloughed employees returning to work on October 17, 2013. Plaintiff was on furlough October 15 and 16 due to the government shutdown. On October 17, Plaintiff went to work to complete her timesheet and CM Nicks asked that she start working. Plaintiff says she refused, consulted with a union representative, and left work. Plaintiff did not work on October 18, because it was her regular day off. Congress authorized back pay for federal employees furloughed during the shutdown.

Plaintiff worked 10 hours, 4 days a week. Plaintiff's timesheet (SETR T&A Record) shows that she received 6 hours of annual leave and 4 hours of administrative leave on October 17. (SETR T&A Record, Oct. 20, 2014, Ex. 28, p. 04269, doc. 23-28.) Friday, October 18 was Plaintiff's regular day off. Plaintiff was not charged AWOL for either October 17 or October 18. Plaintiff was not disciplined for observing Eid al-Adha in 2013.

11

**D.      Claims Dismissed by the Treasury Complaint Center (Claims 16-18)**

**Claim 16:**      On June 21, 2013, Plaintiff was charged two (2) hours and 15 minutes of AWOL for June 20, 2013, when she sought assistance from the NTEU regarding RCT.

DM Block testified that once Plaintiff provided the requested documentation for the June 20, 2013 absence, the AWOL charge was changed.  (Block Decl. at p. 00269.)

**Claim 17:**      On June 24, 2013, Plaintiff was charged one (1) hour and 30 minutes of AWOL and 8.5 hours of annual leave and was told she could only return to work with a doctor's note.

DM Block testified that once Plaintiff provided the requested documentation, the AWOL charge on June 24, 2013, was changed.  (Block Decl. at p. 00269.)

**Claim 18:**      Management delayed responding to Plaintiff's July 16, 2013 request to review her Employee Performance File ("EPF") and subsequently, beginning on July 29, 2013, limited her review time of the EPF to one-hour increments.

DM Block recalled that CM Nicks was on vacation and then Plaintiff was unavailable, which led to the delay.  (*Id.*)  Plaintiff was permitted a reasonable amount of time to review her EPF pursuant to the National Agreement.  (*Id.*)  The issues dismissed by the Treasury Complaint Center were the subject of union grievances filed by Plaintiff.

Exhibit 29 is a chart of the grievances filed by Plaintiff in 2013.  (Plt. Grievance Chart, Ex. 29, doc. 23-29.)  Exhibit 30 contains copies of grievances filed by Plaintiff and relevant memoranda.  (Plt. NTEU Grievance Form, Aug. 30, 2013, Ex. 30, doc. 23-30.)  Exhibit 34 is a copy of Article 91 of the Collective Bargaining Agreement which addresses the Employee Grievance Procedure.  (Employee Grievance Procedure, Art. 91, Ex. 34, doc. 23-34.)

a.      Counseling memorandum issued to co-workers in Team B103.

Many of Plaintiff's fellow contact representatives were issued counseling or disciplinary memoranda not related to performance.  Attached as Exhibit 31 is a chart with comparative data compiled from Exhibit 32 which consists of redacted copies of counseling memorandums issued to Plaintiff's co-workers.  (2013 Disciplinary Memos. Ex. 31, p. 03822, doc. 23-31; Plt. Co-worker Memos. Ex. 32, pp. 03823-03868, doc. 23-32.)

b.      Processing of Plaintiff's EEO claims.

Plaintiff first contacted an EEO counselor on July 1, 2013.  EEO counseling commenced on August 6, 2013.  Plaintiff filed her formal complaint of discrimination on November 1, 2013.  (Plt. DOT Complaint Ex. 1, p. 00076, doc. 23-1.)  Plaintiff's administrative hearing request was

withdrawn on May 29, 2015.  (Complaint at Ex. A, doc. 1-1.)  A final agency decision was issued on July 30, 2015.  (DOT Final Agency Decision Ex. 36, doc. 23-36.)

## II.    Discussion

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  An issue of fact is only genuine if it has a real basis in the record, and is material if it "might affect the outcome of the suit under the governing law[.]"  *Id.* at 248.  When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences."  *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(c); *see also Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir. 2007) ("mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment").  In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.    Procedural Issues

The Court first takes up the procedural issues raised by Defendant's motion for summary judgment, which include whether any of Plaintiff's claims are barred from this Court's review (1) for failure to exhaust administrative remedies or (2) on the basis of Plaintiff's election pursuant to her Collective Bargaining Agreement.

### 1.     Exhaustion of Administrative Remedies

#### a.     Plaintiff's claims are not time-barred by the 45 day window

Defendant argues that any allegation of discrimination prior to May 15, 2017, should be barred for failure to exhaust administrative remedies.  Before filing a lawsuit in federal court on an employment discrimination claim, an employee must fully exhaust his or her administrative remedies.  *Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003).  A federal employee plaintiff is required to first contact an EEO counselor within 45 days of the date of the matter alleged to be discriminatory or of the effective date of the alleged discriminatory personnel action.  *Id.* (internal quotation marks and citation omitted); 29 C.F.R. § 1614.105(a)(1).  Any alleged discrete discriminatory acts that occurred outside of this 45-day window are considered time-barred.  *Id.*

Here, the parties agree that the earliest date on which Plaintiff brought her discrimination claims against Defendant to an EEO officer was when she sought EEO counseling on July 1, 2013.  (Def.'s Supporting Suggestions at p. 26, doc. 23; Plt.'s Opposing Suggestions at p. 32-33, doc. 29.)  Therefore, any discrimination claims regarding discrete acts that occurred prior to May 17, 2013,[5] would be time-barred.  However, Defendant neither argues that a specific discrete act occurred before this the 45-day window, nor does the Court's review of the record before it reveal such act.  Consequently, the Court does not find that any of Plaintiff's claims are time-barred.

#### b.     Plaintiff's claims not asserted in the EEO process are barred

Defendant next argues that several of Plaintiff's claims are barred by the exhaustion of remedies doctrine because they were raised for the first time in Plaintiff's federal court Complaint.  Plaintiff opposes this argument, contending that none of her claims are barred because each claim was either specifically included in, or it is reasonably related to, her administrative action.

A plaintiff will be deemed to have exhausted administrative remedies for all allegations contained in the judicial complaint that are "like or reasonably related to the substance of charges timely brought before the EEOC."  *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994); *see, e.g.*, *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847 (8th Cir. 2012)

---

[5] Although both parties indicate May 15 as the cut-off date for the 45-day window, based on the Court's calculation, May 17 and not May 15 is the resultant date.

(concluding that the plaintiff failed to exhaust her administrative remedies because her retaliatory claim was not reasonably related to her EEOC charge, which was filed before the alleged retaliation action took place). For purposes of the exhaustion requirement, a court may liberally construe an administrative charge, however, the scope of a civil suit may only be as broad as the administrative investigation which could reasonably be expected to grow out of the administrative charge. *Dittemore v. Transit Auth. of Omaha*, No. 8:16-CV-23, 2016 U.S. Dist. LEXIS 93720, at *10 (D. Neb. July 19, 2016) (citing *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 671 (8th Cir. 1994)). The reason for this requirement is to "provide the EEOC with an initial opportunity to investigate allegations of employment discrimination and to work with the parties toward voluntary compliance and conciliation." *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005).

A review of the final agency decision issued by the DOT ("FAD") in response to Plaintiff's administrative action reveals that the following claims were not raised during the administrative process: (1) Plaintiff was required to seek the assistance of her union to be permitted to take religious time off (doc. 1 at ¶ 36(a)); (2) deliberate manipulation of Plaintiff and interference with her ability to make up religious compensatory time in advance (doc. 1 at ¶ 36(d)); (3) alteration of the manner in which employees were to seek religious time off or RCT (doc. 1 at ¶ 36(f)); and (4) disregard of actual time worked by Plaintiff as RCT[7] (doc. 1 at ¶ 36(g)). These claims are therefore barred for failure to exhaust administrative remedies.

### 2. Plaintiff's Claims 12, 14, 16, and 17 are background for her hostile work environment claims

In its motion, Defendant argues that the Court should dismiss Claims 12, 14, 16, 17, and 18, because the issues presented in them pertain to grievances Plaintiff elected to present pursuant to her Collective Bargaining Agreement, which Defendant maintains is a preclusion to a Title VII action until the grievance procedure is exhausted. In response, Plaintiff states that none of the grievances cited by Defendant have been submitted as part of her claims, but instead are included, and can be considered as background for her hostile work environment claims. (Doc. 29 at 41.) Defendant rests its reply on Plaintiff's concession that the issues addressed in the grievance procedure can only be considered as background for Plaintiff's hostile work

---

[7] Even assuming this claim was fully exhausted, Plaintiff has not supported with evidence her allegation that she was denied pay for any compensatory time.

environment claims. (Doc. 32 at 18.) The Court agrees with the parties' consensus that Claims 12, 14, 16, and 17 can be considered as background.

### C. Analysis of Plaintiff's Claims Subject to McDonnell Douglas Burden-Shifting

With regard to Plaintiff's remaining claims, none of which present direct evidence of employment discrimination, the parties agree that the Court should apply the three-step framework laid out in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). (Doc. 23 at 32; Doc. 29 at 36.) At step one, a plaintiff bears the initial burden to establish a prima facie case of discrimination or retaliation. *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015). If a plaintiff satisfies that burden, then at step two, the burden shifts to the employer "to articulate a legitimate reason for the adverse action." *Pederson v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1054 (8th Cir. 2015). If the employer articulates a legitimate reason, then at step three, the burden returns to the plaintiff to show that the given reason is pretext for discrimination. *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014). For the reasons below, Plaintiff's initial burden to establish a prima facie case for her remaining claims has not been met.

### 1. Discrimination Based on Race or Religion under Counts I and II

To establish a prima facie case for race or religious discrimination, Plaintiff must demonstrate "(1) [s]he was a member of a protected group; (2) [s]he was qualified to perform the job; (3) [s]he suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Huynh v. United States DOT*, 794 F.3d 952, 958 (8th Cir. 2015) (citation omitted). It is undisputed that Plaintiff meets the first element of this test regarding both her claims for race and religious discrimination. Plaintiff is African American and a practicing Muslim. It is also undisputed that Plaintiff meets the second element of this test in that she can and has performed the essential functions of her job to expected levels of performance.

With regard to the third element, adverse employment action means "termination, demotion, transfers involving changes in pay or working conditions, and negative evaluations used as the basis for other employment actions." *Id.* (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 969 (8th Cir. 1999) (other citation omitted). The Eighth Circuit has repeatedly defined an adverse employment action to be "a tangible change in working conditions that produces a material employment disadvantage [which can include] changes that affect an employee's future career prospects." *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015). Not everything that

makes an employee unhappy is actionable, *Duffy v. McPhillips*, 276 F.3d 988, 991-92 (8th Cir. 2002), and minor or unpalatable changes in duties or working conditions do not rise to the level of adverse employment action, *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007). The key question is whether a reasonable employee would have found the employer's action to be materially adverse. *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1132 (8th Cir. 2014).

When taking the evidence in the light most favorable to Plaintiff, Plaintiff has failed to present evidence of a change in work duties, conditions, or any specific act by her employer that rises to the level of what a reasonable employee would have found to be materially adverse. The Court thus finds that Plaintiff cannot establish a prima facie case for discrimination claims because she has not presented evidence that she experienced an adverse employment action.

Plaintiff was not suspended or terminated. Plaintiff has not supported with evidence her allegation that she was denied pay for any compensatory time. None of Plaintiff's complaints, including the cited management decisions regarding Plaintiff's leave requests, work assignment to cover the phones, and training, are tantamount to an adverse employment action. Plaintiff cites to no evidence to support that any of the memoranda issued to her led to a material employment disadvantage. *See Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1058 (8th Cir. 2007) ("A reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse."); *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1079 (8th Cir. 2006) (citing *Spears v. Missouri Dep't of Corr. Human Res.,* 210 F.3d 850, 854 (8th Cir. 2000) (en banc)).

In her opposing suggestions, Plaintiff hones in on her performance evaluation review where she received a rating of "exceeds fully successful" and acts by her managers in charging her AWOL. First, Plaintiff's "exceeds fully successful" performance review was not an adverse employment action. Even if the "exceeds fully successful" rating amounted to a poor performance review, "[a] poor performance rating does not in itself constitute an adverse employment action" unless it has a "tangible effect" on a plaintiff's employment. *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 633 (8th Cir. 2016) (quoting *Spears*, 210 F.3d at 854). Plaintiff argues that this performance review rating caused her to miss out on a financial performance award, a step increase, and promotion to a work leader, but cites to no evidence to support her contentions. Plaintiff also does not present any evidence that she has ever received a

higher rating on a performance evaluation. Second, Plaintiff has not provided evidence of any unwarranted AWOL notations that were not later adjusted to LWOP or RCT.

Consequently, Plaintiff has not made her prima facie case for discrimination on the basis of race or religion. Plaintiff failed to raise a triable question of material fact as to whether she suffered an adverse employment action.

### 2. Disparate Treatment Based on Race or Religion in Counts I and II

Plaintiff has also not supported with evidence her allegations that she was subjected to disparate treatment with respect to her leave requests, work assignments, or the amount of performance feedback or evaluation reviews. *See Devin v. Schwan's Home Serv.*, 491 F.3d 778, 789 (8th Cir. 2007) (abrogated on other grounds) (the fourth element of a plaintiff's prima facie is established by showing that similarly situated employees who were not members of the protected class were treated differently). Plaintiff's claim for disparate treatment also fails because she has not demonstrated that she has suffered any adverse employment action. *E.g., Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) (prima facie case of disparate treatment requires plaintiff to show an adverse employment action). Therefore, Defendant is entitled to summary judgment on Plaintiff's claims for disparate treatment.

### 3. Discrimination for Failure to Provide Religious Accommodation under Count I (Claims 14-15)

Plaintiff's claim under Count I for discrimination for failure to accommodate Plaintiff's religion also fails. To establish a prima facie case of religious discrimination for failure to accommodate, a plaintiff must show (1) she has a bona fide religious belief that conflicts with an employment requirement; (2) informed the employer of this belief; and (3) was disciplined for failing to comply with the conflicting requirement. *E.g., Jones v. TEK Indus., Inc.*, 319 F.3d 355, 359 (8th Cir. 2003); *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1340 (8th Cir. 1995). Plaintiff cannot establish her prima facie case because Plaintiff was not disciplined, threatened with discipline, or subject to an adverse employment action for observing religious holidays. In addition, Plaintiff has not provided evidence of any unwarranted AWOL notations for absences to observe religious holidays that were not later adjusted to RCT.

### 4. Hostile Work Environment under Counts I and II

Plaintiff alleges claims of a hostile work environment due to discrimination on the basis of her religion under Count I and on the basis of her race under Count II. Under Title VII, it is "unlawful employment practice for an employer . . . to discriminate against any individual with

18

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has interpreted the phrase "terms, conditions, or privileges of employment" to include disparate treatment of individuals such as requiring individuals to work in a hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

The Eighth Circuit has explained that claims for hostile work environments have the following elements:

> (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment. In addition, for claims of harassment by non-supervisory personnel, [the plaintiff] must show that [her] employer knew or should have known of the harassment and failed to take proper action.

*EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 683 (8th Cir. 2012) (internal and additional citations omitted) (alterations in original). For a workplace to come within the scope of what is prohibited under Title VII, a workplace must be "permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment[.]" *Harris*, 510 U.S. at 21 (internal citations and quotation marks omitted). The threshold for actionable harassment is high, requiring harassment that is so intimidating, offensive, or hostile such that it poisons the work environment. *Blomker v. Jewell*, 831 F.3d 1051, 1057 (8th Cir. 2016) (citing *Scusa*, 181 F.3d at 967). A few isolated incidents are not enough unless they are extremely serious. *Id.*

Specific to the fourth element, "[t]he harassment . . . [must] be severe or pervasive enough to create an objectively hostile or abusive work environment and the [plaintiff] must subjectively believe her working conditions have been altered." *Blomker*, 831 F.3d at 1056 (internal quotation marks omitted) (citing *Harris*, 510 U.S. at 21). The fourth element therefore involves both objective and subjective components. *Id.* The Court must examine the totality of the circumstances to determine if the environment was sufficiently hostile, which includes consideration of the frequency of the discriminatory conduct, the conduct's severity, and whether the conduct unreasonably interfered with a plaintiff's workplace. *Crutcher-Sanchez v. Cty. of Dakota*, 687 F.3d 979, 986 (8th Cir. 2012) (citation omitted).

The Court finds that Plaintiff cannot establish a prima facie case for her claims of hostile work environment. It is undisputed that Plaintiff felt harassed or intimidated based on her race

and religion, but she fails to cite sufficient evidence to show that the work environment was objectively hostile.

The incidents cited by Plaintiff involving management decisions regarding her leave are insufficient evidence of conduct that is sufficiently severe or pervasive on the issue of whether Plaintiff's workplace was hostile. There were no unwarranted AWOL notations that were not later adjusted to LWOP or RCT. Plaintiff's FMLA request was approved once additional medical information was provided. Plaintiff does not allege that she was denied RCT. Similarly, based on the facts here, decisions regarding work assignment and training do not rise to the requisite level of harassment.

In addition, none of the memoranda issued to her led to a material employment disadvantage. Plaintiff was not disciplined or threatened with discipline for observing religious holidays. Plaintiff has not supported with evidence her allegation that she was denied pay for any compensatory time. Plaintiff has not supported with evidence her allegations that she was subjected to disparate treatment with respect to her leave requests, the amount of performance feedback or evaluation reviews.

Plaintiff does not allege she was touched or that any offensive, vulgar language or slur regarding her race or religion was directed at her or spoken in her presence. Plaintiff does not recite any insult, racial or religious jokes made to her. Rather, Plaintiff focuses on a sworn statement she received from an employee that CM Nicks frequently used offensive and vulgar language when speaking of Plaintiff and other African American employees.

Considering the totality of the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has not presented evidence to show harassment so severe or pervasive that it satisfies the high threshold for racial or religious discrimination claims based on hostile work environment. Plaintiff has failed to present evidence that either separately or cumulatively rises to the level of what a reasonable employee would have found to be materially adverse.

For these reasons as well as the reasons explained above with respect to Plaintiff's failure to establish an adverse employment action, even if a genuine material fact exists regarding whether Plaintiff was subject to the high threshold of what constitutes actionable harassment, Plaintiff has not shown a change in a term, condition, or privilege of employment. Therefore, Plaintiff failed to raise a triable question of material fact for her claims for hostile work environment.

### 5. Retaliation under Count III

To establish a prima facie case for retaliation in violation of Title VII, Plaintiff must demonstrate: (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) a causal connection exists between the conduct and the adverse action. *Wilson v. Ark. Dep't of Human Servs.*, 2017 U.S. App. LEXIS 3683, at *5 (8th Cir. Mar. 1, 2017). As explained above, Plaintiff has not presented evidence that she experienced an adverse employment action. Consequently, Plaintiff has not made her prima facie case for retaliation.

### 6. Articulation of Legitimate Non-Discriminatory Reasons under Counts I, II, and III

Even assuming Plaintiff was able to establish a prima facie case for discrimination and retaliation under Counts I, II, and III, she has failed to demonstrate Defendant's articulated non-discriminatory and non-retaliatory reasons for the employer's conduct is pretext. As stated above, if a plaintiff satisfies the initial burden, at step two the burden shifts to the employer "to articulate a legitimate reason for the adverse action." *Pederson*, 775 F.3d at 1054.

Here, management has articulated legitimate, non-discriminatory and non-retaliatory reasons for actions taken regarding Plaintiff, and management decisions regarding Plaintiff's leave requests, work assignment to cover the phones, and training. Plaintiff's supervisors deny harassment or intimidation of Plaintiff, report that Plaintiff was provided critical feedback on performance or conduct issues, and state that similar feedback was addressed with all employees. Plaintiff does not dispute instances where she failed to follow instructions, procedures, or was off-task.

Upon the articulation of a legitimate reason, at step three, the burden returns to the plaintiff to show that the given reason is pretext for discrimination. *Young*, 754 F.3d at 578. To show pretext, "a plaintiff must present sufficient evidence to show both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason[.]" *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010). The plaintiff must do more than merely create a factual dispute on the issue of pretext, but must offer sufficient evidence for a reasonable inference of discrimination. *Id.*

Considering the totality of the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has not presented sufficient evidence to allow a reasonable trier of fact to find

Defendant's articulated reasons to be false or pretext for unlawful discrimination or retaliation. Consequently, Defendant is entitled to summary judgment because Plaintiff cannot meet her burden to show pretext.

## III.    Conclusion

The Court concludes that Plaintiff failed to present sufficient evidence to raise a genuine issue of material fact for trial as to whether Defendant discriminated against her on the basis of race or religion, or retaliated against her on the basis of protected EEO activity.  Therefore, Defendant's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED:  March 17, 2017

22